UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE: FF ACQUISITION CORP. D/B/A FLEXIBLE-FLYER CASE NO. 05-16187-DWH

DAVID ANGLES, ET. AL. PLAINTIFFS

VERSUS ADV. PROC. NO. 07-1193-DWH

FLEXIBLE FLYER LIQUIDATING TRUST, f/k/a
FF ACQUISITION CORP., d/b/a FLEXIBLE-FLYER DEFENDANT

OPINION

On consideration before the court is a complaint filed by the plaintiffs, David Angles, et. al., against the defendant, Flexible Flyer Liquidating Trust, f/k/a FF Acquisition Corp., d/b/a Flexible-Flyer, (hereinafter "Flexible Flyer"), seeking damages for an alleged violation of the Worker Adjustment and Retraining Notification Act, (hereinafter "WARN Act"); an answer, including affirmative defenses, having been filed by Flexible Flyer; on proof in open court; and the court, having heard and considered same, hereby finds as follows, to-wit:

I.

JURISDICTION AND PLEADINGS SUMMARY

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157. This is a core proceeding as defined in 28 U.S.C. §157(b)(2)(A), (B), and (O).

On September 9, 2005, Flexible Flyer filed a voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code. On this same date, Flexible Flyer terminated

all manufacturing activities and issued a notice pursuant to the WARN Act that it was ceasing its business operations. A copy of this notice, which was attached to the plaintiffs' motion for summary judgment, is appended hereto and incorporated herein by reference.

In their complaint, the plaintiffs allege that Flexible Flyer failed to comply with the WARN Act by failing to give its employees a sixty day layoff notice as required by 28 U.S.C. §2102. Flexible Flyer does not dispute that the provisions of the WARN Act were triggered. There were more than 100 employees at the time of the plant closing on September 9, 2005, (28 U.S.C.A. §2101), and Flexible Flyer admits that it failed to give a sixty day written layoff notice. However, in its answer to the plaintiffs' complaint, Flexible Flyer asserts the following primary defenses for its failure to give the sixty day notice, to-wit: 1) unforeseen business circumstances; 2) the faltering company exception; and 3) that it gave as much notice as it possibly could under the circumstances. The applicability of these defenses is the critical determinative in this proceeding.

II.

FACTUAL SUMMARY

Flexible Flyer manufactured swing sets, hobby horses, go-carts, utility vehicles, fitness equipment, and related products that were sold to Wal-Mart, Toys-R-Us, K-Mart, Sam's Club, as well as, other large and small retailers. Flexible Flyer enjoyed long term relationships with most of its customers, who would make purchases through written orders or, on occasion, through verbal orders.

The operating capital needs of Flexible Flyer were obtained through a factoring arrangement with CIT Group Commercial Systems, LLC, (hereinafter "CIT"), which purchased

Flexible Flyer's eligible accounts receivable. CIT would advance Flexible Flyer eighty percent of the eligible receivables that it acquired, and then collect the receivables. CIT charged interest on the advances, and, once a receivable was collected, CIT retained twenty percent of the collected funds and gave Flexible Flyer credit for the balance. The factoring arrangement with CIT, plus infusions of capital from Cerberus Capital Management Corporation, (hereinafter "Cerberus"), Flexible Flyer's parent company, were Flexible Flyer's primary sources of operating funds for approximately five years. Cerberus was an equity "hedge" fund which owned assets totaling $16 billion. Over time, Cerberus infused in excess of $109 million into Flexible Flyer, and, until September, 2005, had never refused to extend essential financing to the company.

In calendar year 2005, Flexible Flyer began experiencing unusual financial and operational problems. In April, the go-cart employees were informed that the go-cart line might be eliminated. In June, Flexible Flyer's go-carts were subjected to a recall of 10,000 units due to defective ball joints. However, according to the testimony of Michael Earrey, Flexible Flyer's Chief Financial Officer, only one to two thousand of these units were actually returned to the company. Flexible Flyer had contracted with a new vendor, Vialink, Inc., for the supply of the ball joints which were to be manufactured in China. Because of accidents and related injuries, allegedly resulting from the defective ball joints, Flexible Flyer was confronted with numerous product liability lawsuits across the country. Flexible Flyer filed a lawsuit against Vialink which was ultimately settled through mediation. The product liability lawsuits are still being defended by Flexible Flyer's insurers.

During this time frame, three of Flexible Flyer's major customers unexpectedly decided to defer the purchase of $5,000,000 in swing sets from June and July, 2005, until the following

year. Coincidentally, after Flexible Flyer filed its bankruptcy case, these same swing sets were sold at full market value to these customers in December, 2005.

To further exacerbate Flexible Flyer's problems, another customer, Tractor Supply Company, withheld payments totaling approximately $300,000 for merchandise that had already been shipped.

After being confronted with this series of problems, Earrey testified that Flexible Flyer initiated negotiations with both its customers and its suppliers for more favorable transactional terms. Earrey indicated that in August, 2005, he was able to convince Wal-Mart to pay its invoices sooner, and that several vendors agreed to defer payments that were due from Flexible Flyer.

Other negotiations were on-going to encourage the swing set customers to accept the delivery of the swing sets as originally contemplated. Ironically, due to the bankruptcy of its primary domestic competitor, Flexible Flyer became the only manufacturer of swing sets in the United States. According to Earrey, this was a very positive factor which he believed would be helpful in getting the deferment date "rolled back." However, Earrey had difficulty in promptly getting written commitments from these customers as to a projected delivery date or regarding future orders.

During the time that these negotiations were on-going, in June, July, and August, 2005, Earrey indicated that he thought Flexible Flyer was still viable as a going concern business. Earrey included projections for 2006 in a presentation that he made to Wal-Mart. He testified that he thought the company would have to eliminate its go-cart division and perhaps "spin off" or sell its fitness division. After scaling the operations downward, he wanted the company to

focus its attention primarily on manufacturing and selling swing sets and hobby horses. He thought that these modifications would return Flexible Flyer to profitability. See Defendant's Exhibits 8B and 8C.

CIT and Cerberus constantly monitored Flexible Flyer's financial and operational performance. Within two to three weeks prior to Flexible Flyer's filing its bankruptcy petition, CIT reduced its advance rate on receivables from eighty percent to fifty percent, and, immediately prior to filing, CIT cut the rate to zero, effectively terminating the factoring arrangement. Cerberus refused to infuse any additional capital into the business due to the unavailability of the aforementioned written commitments from Flexible Flyer's customers. Earrey testified that he had "no clue" that CIT was contemplating reducing its advance rate to 50%, and then to zero. He was equally surprised that Cerberus declined to provide additional capital, particularly since it had not refused to do so when an infusion was absolutely necessary. With no sources of working capital, Flexible Flyer was compelled to file for bankruptcy protection on September 9, 2005, only two days after CIT's final reduction.

Earrey testified that each of the plaintiffs in this proceeding was paid in full for all work that they performed, as well as, that if they were entitled to employee benefits, they received those also. On Exhibit C, which was attached to the plaintiffs' motion for summary judgment, the plaintiffs calculated their WARN Act damages, based on a sixty day violation period, in the total sum of $659,736.41. In addition to those damages, the plaintiffs' attorneys assert that they are entitled to fees and costs for prosecuting this proceeding.

Earrey indicated that, while he was aware of the WARN Act's notification requirements, he did not anticipate a "shut down" of operations until CIT reduced its advance rate and then,

shortly thereafter, terminated the factoring arrangement altogether. Even then, he thought that Cerberus would provide sufficient monies to keep the company afloat. However, once the CIT financing was terminated and there was no infusion of additional capital from Cerberus, the decision to close the facility became suddenly inevitable. There were no available funds to continue operations.

Earrey indicated that he was particularly puzzled by CIT's decision because CIT's claim was significantly over secured. Earrey explained that even though CIT was owed $2,000,000 to $3,000,000 at the time of the bankruptcy filing, that since it held liens on all of Flexible Flyer's inventory and receivables, the collateral value was actually four to five times more than the amount of the debt owed.

Earrey's positive assessment of Flexible Flyer's viability was substantiated significantly by events that occurred shortly after the bankruptcy case was filed, to-wit:

a) The Flexible Flyer Fitness Division was sold at a bankruptcy court auction for $2.3 million, a much higher price than originally anticipated.

b) The complete swing set inventory was sold for full market value in December, 2005.

c) Go-carts, having a value of approximately $2,000,000, were sold.

d) The Flexible Flyer trademark was sold.

e) Parts and assorted assets were sold for approximately $300,000 to $400,000.

f) Tractor Supply Company, remitted its payment for the merchandise previously shipped.

III.

DISCUSSION

In *Allen v. Sybase, Inc.*, 468 F.3d 642 (10th Cir. 2006), 26 former employees of a software company specializing in retail banking and capital markets software filed suit against their former employer and its parent company for violations under the WARN Act. The district court ruled for the employees and ordered the payment of damages, interest, and attorney fees. On appeal, the 10th Circuit affirmed in part, reversed in part, and remanded. The 10th Circuit addressed the purpose of the WARN Act as follows:

> In order to place the facts of this case in their relevant context, we begin with a preliminary discussion of WARN, which we will develop more fully in our analysis. WARN is a remedial statute that generally
>
> > provides protections to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs. Advance notice provides workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market.
>
> 20 C.F.R. §639.1(a). WARN directs that an employer can be liable for up to sixty days' back pay and benefits to certain employees who lose their jobs as part of a plant closing or mass layoff without receiving sixty days' advanced notice. *See* 29 U.S.C. §2104(a)(1). An employer may be excused from the sixty-day notice requirement where a mass layoff was the result of an unforeseen business circumstance. *Id.* at §2102(b)(2)(A). Nevertheless, an employer "shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." *Id.* at §2102(b)(3).
>
> 468 F.3d at 645-46.

Significantly, the court pointed out that the WARN Act generally applies to a <u>planned</u>, <u>proposed</u>, and <u>foreseeable</u> mass layoff, to-wit:

> Unfortunately, WARN is less than clear with respect to mass layoffs occurring in an aggregation setting. As we highlight below, the statute and regulations generally speak in terms of planned, proposed, and foreseeable mass layoffs and employer liability that arises from failure to provide notice in those settings.

468 F.3d at 649-50.

In addition, the court commented on the unforeseen business circumstances exception to the notice requirement, to-wit:

> "The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market." 20 C.F.R. §639.9(b)(2). Commentary to the regulations indicates this is "an objective test [which focuses] on the commercial reasonableness of the employer's actions." Worker Adjustment and Retraining Notification, 54 Fed.Reg. 16,042, *16,062 (April 20, 1989) (codified at 20 C.F.R. 639). The burden is thus on the "employer to show that a 'sudden, dramatic and unexpected' event occurred which precipitated a mass layoff under WARN. *Id.* Where an unforeseen business circumstance has prevented an employer from providing timely notice under WARN, the employer must still "give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. §2102(b)(3).

468 F.3d at 655-56.

Concluding its decision, the court stated that, "aggrieved employees must also be affected employees, i.e., 'employees *who may reasonably be expected to experience an employment loss as a consequence of a proposed...mass layoff* by their employer.'" *Id.* at 663. The court remanded the case for further proceedings on the disputed issue of whether the plaintiffs were affected employees under 29 U.S.C. §2101(a)(5).

In *Hotel Employees and Restaurant Employees International Union Local 54 v. Elsinore Shore Associates*, 173 F.3d 175 (3rd Circuit, 1999), the former employees of the Atlantis Hotel and Casino, which was owned by Elsinore Shore Associates, brought suit against the owner for

the failure to provide a 60 day notice of the closing of the casino pursuant to the WARN Act. The closing had been ordered by the New Jersey Casino Control Commission. The District Court concluded that Elsinore's failure to provide the WARN Act notice was excused by the unforeseeable business circumstances exception. This decision was affirmed on appeal.

The Third Circuit also commented on the purpose of the WARN Act as follows:

> Congress's purpose in enacting WARN may provide more guidance. The WARN Act was adopted in response to the extensive worker dislocation that occurred in the 1970s and 1980s. *See* Richard W. McHugh, *Fair Warning or Foul? An Analysis of the WARN Act In Practice*, 14 Berkeley J.Emp. & Lab.L. 1, 4 (1993). As companies were merged, acquired, or closed, many employees lost their jobs, often without notice. In some circumstances, the projected closing was concealed from the employees. *See* Christopher P. Yost, *The Worker Adjustment and Retraining Notification Act of 1988; Advance Notice Required?*, 38 Cath.U.L.Rev. 675, 676 (1989). Congress enacted WARN to protect workers and their families from these situations. *See* 20 C.F.R. §639.1(a) (1998). WARN's notice period was designed to allow workers "to adjust to the prospective loss of employment, to seek and obtain alternative jobs and ... to enter skill training or retraining that will allow [them] to successfully compete in the job market." *Id.* The thrust of WARN is to give fair warning in advance of prospective plant closings. It would appear, therefore, that if an employer knew of a government-ordered closing and failed to notify its employees, the WARN Act would apply.

173 F.3d at 182.

Similar to the factual events in the subject proceeding, the court noted that Elsinore Shore Associates made every effort to keep the Atlantis Casino open or, alternatively, to make a commercially reasonable sale of the casino. In affirming the judgment of the district court, the Third Circuit also concluded that the unforeseen business circumstances exception was applicable, to-wit;

> As noted, Elsinore Shore Associates had some notice the Casino Control Commission might revoke or fail to renew the Atlantis' license in the spring of 1989. The WARN Act requires an employer to give 60 days' notice of the projected date of closing. In the event that an unforeseeable business circumstance arises, the notice period may be reduced or eliminated. The unforeseeable business circumstances exception applies if the employer,

> in the exercise of commercially reasonable business judgment, could not reasonably have foreseen the closing 60 days in advance and within a 14-day window. For the reasons expressed, this exception applies here.

173 F.3d at 187.

As to the unforeseen business circumstances exception to the requirement of a 60 day written layoff notice, the employer must show, (1) the circumstances were unforeseeable, and (2) the layoffs were caused by those circumstances. *See, Roquet v. Arthur Andersen, LLP*, 398 F.3d 585, 588 (7th Cir. 2005), and *Halkias v. General Dynamics Corporation*, 137 F.3d 333 (5th Cir. 1998). In this proceeding, whether or not the circumstances that caused the shutdown of Flexible Flyer were foreseeable was vigorously contested. The plaintiffs asserted that the shutdown was foreseeable for the following reasons.

1) From the beginning of Flexible Flyer's business, it was in a deficit position that steadily increased yearly;

2) Flexible Flyer knew as early as the spring of 2005 that layoffs could occur because it informed its go-cart employees of possible layoffs during that same year;

3) In the spring of 2005, Wal-Mart, K-Mart, and Toys-R-Us deferred purchasing swing sets valued at approximately $5,000,000;

4) Go-carts were recalled in June, 2005;

5) Cerberus warned that it would close Flexible Flyer if it did not make a profit; and

6) Flexible Flyer knew that CIT would terminate the factoring arrangement because of the go-cart recall along with the other losses that Flexible Flyer was experiencing.

Through its Chief Financial Officer's testimony, Flexible Flyer adamantly denied that any of the foregoing reasons caused the shutdown in September, 2005. As set forth in the factual summary hereinabove, Michael Earrey indicated that while some of these events did occur, he

worked tirelessly to overcome them. Considering the effectiveness of Earrey's remedial proposals as they actually unfolded, Earrey's exercise of his business judgment, in keeping Flexible Flyer going and in anticipating that Flexible Flyer would continue operations into 2006, was completely reasonable.

Earrey testified that the abrupt reduction by CIT of its advance rate and then, shortly thereafter, the reduction of that rate to zero was the unforeseen circumstance that primarily caused the closing of Flexible Flyer. He also indicated that it was completely unforeseeable, based on past experience, that Cerberus would refuse to supply an essential capital infusion. Earrey maintained that Flexible Flyer would have continued to operate as a going concern but for the combined actions of CIT and Cerberus in terminating the availability of all funds needed to operate.

As a second defense to the plaintiffs' claims, Flexible Flyer has asserted the "faltering company" exception to the WARN Act's noticing requirement. The Department of Labor regulation that interprets the "faltering company" exception lists four requirements that must be established by the employer to establish the exception, to-wit: 1) the employer must have been actively seeking capital at the time the 60 day notice would have been required; 2) the employer had a realistic opportunity to obtain the financing sought; 3) the financing would have been sufficient, if obtained, to enable the employer to avoid or postpone the shutdown; and 4) the employer reasonably and in good faith believed the 60 day notice would have precluded it from obtaining financing. 20 C.F.R. §639.9(a).

Flexible Flyer had adequate financing in place coupled with the potential "back-up" support from its parent Cerberus. Earrey had no thoughts that either of these were in jeopardy.

The continuation of the CIT lending arrangement at an 80% advance rate would have allowed Flexible Flyer to continue its operations and avoid a total shutdown. As noted hereinbelow, a WARN Act notice, which was not thought necessary in July or August, 2005, could have had a negative effect on Flexible Flyer's viability with its employees, as well as, its lender.

In *Carpenters District Council of New Orleans & Vicinity v. Dillard Depart. Stores, Inc.*, 15 F.3d 1275 (5th Cir. 1994), the merger of D.H. Holmes Co., Ltd., into Dillard Department Stores, Inc., resulted in the layoff of a large number of employees whose job functions had become redundant. Because no 60 day WARN Act notice had been given by either of the entities, the former employees filed a cause of action. Both the unforeseen circumstances exception and the faltering company exception were raised as defenses to the claims. While the Fifth Circuit determined that neither of the exceptions was applicable, it recognized the efficacy of both exceptions and discussed when their use might be effective. The court's opinion, authored by Circuit Judge E. Grady Jolly, provides the following insight:

> Although Dillard and Holmes acknowledge that certain affected employees did not receive the full sixty days notice of termination, they argue that they were excused from the notice requirements because they fell within one of the two statutory exemptions. Under the facts of this case, Dillard and Holmes can escape WARN Act liability only if either the "faltering company" exception of the "unforeseen business circumstances" exception applies.
>
> To fall within the "faltering company" exemption, an employer must meet four requirements. The Act states that
>
> an employer may order the shutdown of single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that the giving the notice required would have precluded the employer from obtaining the needed capital or business.

> 29 U.S.C. §2102(b)(1) (Supp. 1993). This exception applies only when a layoff is caused by the employer's failure to obtain sufficient capital. *See* 54 Fed.Reg. 16061 (April 20, 1989) ("The need for notice will only be triggered if the employer fails to obtain the business or financing it seeks."). In this case, however, there is no causal connection between Holmes's search for capital and the ultimate reduction in work force. Although it is true that at the time notice should have been provided Holmes was actively searching for a new line of credit, the actual cause of the mass layoff was not a failure to obtain an adequate line of credit; instead, the cause of the layoff was the merger between Holmes and Dillard. Because there was no causal relationship between Holmes's search for additional capital and the reduction in its work force, the "faltering company" exception does not apply to exempt it from liability for failing to give notice for the ultimate layoff, which was in fact caused by the merger.
>
> Next, Dillard contends that its failure to provide the full sixty days notice was excused under the "unforeseen business circumstances" exemption. This exemption provides that "[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. §2102(b)(2)(A) (Supp.1993). According to the proposed rules, an unforeseeable circumstance is "caused by some sudden and unexpected action or condition outside the employer's control." 20 C.F.R. §639.9(b)(2) (1988) (proposed regulations). As with the "faltering company" exception, this exception to the general rule is to be narrowly construed. 20 C.F.R. §639.9(a) (1989) (final regulations).

15 F.3d at 1281-82.

*See also, In re APA Transport Corp.*, 541 F.3d 233 (3rd Circuit 2008).

IV.

CONCLUSION

The court is of the opinion that while the unforeseen business circumstances exception and the faltering company exception both have application to this proceeding, the unforeseen business circumstances exception is by far the most compelling. Since the decision was made to shutdown the Flexible Flyer operations on or about September 9, 2005, the 60 day notice period would relate back to one or two days on either side of July 9, 2005. At that time, Flexible Flyer was obviously having difficulties on several fronts, primarily the go-cart recall and the deferment

of the purchase of the swing set inventory. The company, however, was reacting to these problems and attempting to rectify them through several remedial measures. According to Earrey's testimony, there was no thought that there would be a complete shutdown of the Flexible Flyer facilities. Substantiating this testimony was the fact that he had included projections for 2006 operations in his presentation to Wal-Mart. He contemplated an orderly downsizing of the business over time, not an immediate shutdown.

Earrey also thought that a WARN Act notification of mass layoffs would be a devastating, self-defeating act. He had already experienced the resignation of three management employees following the notice that was given to the go-cart employees in April, 2005. Regardless, Earrey simply did not contemplate a mass layoff at this time. The court has examined the elements that are required for an effective WARN Act notice, and is of the opinion that Flexible Flyer could not have even formulated a notice that would have been meaningful considering the prevailing circumstances in July or even August, 2005.

As Earrey testified, it was not until after CIT cut the advance rate from 80% to 50% without warning only two to three weeks prior to Flexible Flyer's bankruptcy filing that he realized that layoffs and a plant shutdown were a possibility. The fatal blow, however, came when CIT terminated the financing altogether. For reasons which are somewhat implausible, Cerberus, the parent company, refused to infuse any operating capital. In the opinion of the court, these events were completely unanticipated, and the abrupt unavailability of operating funds caused the layoffs. Consistent with the guidance provided by the authorities cited hereinabove, these circumstances constitute an exception to the WARN Act's notice requirement. The shutdown of Flexible Flyer and the mass layoffs were not planned, proposed, or foreseeable.

Flexible Flyer disseminated a WARN Act notice on the same date that it filed its bankruptcy petition which was the earliest practical date that such a notice could be provided.

The fact that Flexible Flyer had sought legal advice on August 5, 2005, to discuss its options, one of which was obviously a bankruptcy filing, does not adversely implicate the unforeseen business circumstances defense. The fact that bankruptcy was considered as an option does not automatically translate into mass layoffs or an operational shutdown. Many Chapter 11 debtors continue to operate post-petition as going concerns. The difference, however, is that those debtors have a source of operating capital unlike Flexible Flyer whose operating funds had been unexpectedly terminated.

As instructed by the Fifth Circuit's *Dillard* decision, this court has narrowly construed the unforeseen business circumstances exception, as well as, the faltering company exception to the WARN Act notice requirement. Having done so, the court concludes that both of these exceptions apply, particularly, the unforeseen business circumstances exception. Therefore, the plaintiffs' complaint is not well taken and will be dismissed by a separate order to be entered contemporaneously herewith.

This the 26th day of October, 2010.

DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE

September 9, 2005

Dear Plexible Flyer Employee,

(1) As per the requirements of the WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, we must advise you that you may be laid off and it is anticipated that the layoff is permanent;

(2) The expected date of the first separation is September 9, 2005 and the last separation is September 23, 2005. Your anticipated separation date is September 9, 2005:

(3) No bumping rights exist;

You are advised that you may seek information on any possible available Dislocated Worker Assistance by contacting the following:

Dislocated Worker Unit, Labor Assistance Division
Department of Economic and Community Development
301 West Pearl Street
Jackson, MS 39203-3089

The name and telephone number of the Chief Executive Officer of the company to contact for further information is:

Mr. Alex Garcia
Chief Executive Officer
FF ACQUISITION CORP.
100 Tubb Avenue
West Point, Mississippi 39773
(662) 494-4732

The reasons necessitating the immediate plant closing and resulting layoffs are the result of unforeseeable business circumstances caused by the failure of the Company's three principal customers (representing more than 70% of the customer base), Wal-Mart, K-Mart and Toys R'Us, to provide the Company with written commitments for orders by August 31, 2005. As a result we could not provide CIT, our primary source of funding, with a business plan that showed we would be able to meet the Company's cash flow demands. Without enough cash to pay the Company's debts, we will not be able to continue to operate Flexible Flyer going forward. Given this dramatic and unforeseeable situation, the Company has made the decision to discontinue all product lines.

Please note that this WARN notice supersedes the previous WARN notice dated August 2, 2005, given with respect to a sub-set of the business.

The Company regrets this course of action because it involves the end of a proud history and the layoff of loyal, dedicated and highly regarded employees. It is with heartfelt sympathy and sadness that this action is necessitated, but economic circumstances mandate it.

Very cordially yours,

Alex Garcia
CEO, FF Acquisition Corp.